2010 Ark. App. 851

**Carolyn COLEMAN, Appellant**

v.

**ARKANSAS DEPARTMENT OF HUMAN SERVICES,**
**Appellee.**

**No. CA 10–817.**

Court of Appeals of Arkansas.

Dec. 15, 2010.

Therese M. Free, Little Rock, for appellant.

Keith L. Chrestman, Chrestman Group, PLLC, Jonesboro, Tabitha Baertels McNulty, Little Rock, for appellee.

JOHN B. ROBBINS, Judge.

Carolyn Coleman appeals the Greene County Circuit Court's order awarding permanent custody of her daughter, K.W. (born 4/3/02), and her son, C.W. (born 8/3/03), to their father, Eddie Wester, and closing their portion of the dependency-neglect case. The court allowed Coleman's third child, K.C. (born 3/19/94), to remain in her custody and kept her portion of the case open.[1] Coleman asserts that the court erred in granting permanent custody of K.W. and C.W. to their father and closing their portion of the case at the permanency-planning hearing by not following certain statutory requirements regarding the termination of reunification services. Finding no error, we affirm.

The Department of Human Services (DHS) had been involved with the family since June 2008. On November 7, 2008, DHS petitioned for emergency custody of all three children. According to the affidavit filed with that petition, the children were living with Gloria Tensley, their guardian. The home in which the children were living was cluttered. There were allegations that the children had hygiene problems reported by the school; that Tensley had failed to take K.W. to a medical appointment; that Tensley spoke negatively about Coleman to the children; that she yelled and cursed at the children; that she was abusive to K.W.; and that she locked K.C. out of the home. There were also allegations that Tensley threatened to take the children to a Native American reservation if DHS attempted to place the children in foster care. An order for emergency custody was entered on November 7, 2008.

The court later found probable cause for entry of the emergency order. The probable-cause order required Coleman to cooperate with DHS, remain drug free and submit to random drug tests, submit to a drug and alcohol assessment and follow its recommendations, and obtain and maintain stable housing and employment.

On January 7, 2009, the court held an adjudication hearing and found all three children dependent-neglected. Temporary custody of all three children was awarded to Tanya and Phillip Simpson. The goal of the case was to be reunification. Coleman's visitation with the children was to be supervised, with DHS given the discretion to increase the visitation both as to the type and length of the visits. Coleman was ordered to cooperate with DHS, follow the court's orders and the case plan, remain drug free and submit to random drug tests, submit to a drug and alcohol assessment and follow its recommendations, obtain and maintain stable housing and employment, and submit to a psychological evaluation and follow the recommendations. The case was referred to the Office of Child Support Enforcement to pursue collection of child support.

A review hearing was held on March 30, 2009. The court found that Coleman had complied with the case plan by submitting to random drug screens, submitting to a drug and alcohol assessment and following the recommendations for outpatient treatment, submitting to a psychological evaluation, obtaining stable housing, and attempting to find employment. The court also placed the children on a thirty-day trial placement with Coleman. If there were no problems, legal custody of the children would be returned to Coleman at the end of the trial placement. After a successful trial visit, custody of all three

1. Wester is not K.C.'s father.

children was returned to Coleman on April 23, 2009.

Another review hearing was held on August 26, 2009. The court found that it was in the children's best interests for their custody to remain with Coleman following the successful trial placement. The court found that, although Coleman had not completed parenting classes, she had otherwise complied with the case plan.

On September 4, 2009, the department filed a petition seeking emergency custody due to Coleman's arrest for outstanding fines and a caregiver being unavailable. An order of emergency custody was entered on September 4, 2009. The probable-cause order gave DHS the discretion, subject to approval by the attorney ad litem, to return custody to Coleman upon her release. Such an agreed order returning custody was entered on October 6, 2009.

On October 26, 2009, Eddie Wester filed a petition seeking visitation with K.W. and C.W. The petition asserted that, although Wester and Coleman were never married, he had acknowledged his paternity by having his name placed on the children's birth certificates and that he had provided for the children.

Another review hearing was held on October 30, 2009. Custody of the children remained with Coleman. The court found that Coleman had complied with the case plan by submitting to random drug screens, submitting to a drug and alcohol assessment and following the recommendations for outpatient treatment, submitting to a psychological evaluation, obtaining stable housing, and attending some parenting classes. The court granted Wester standard weekend visitation. The court noted that K.C. had been improperly thrust into the role of a parent by having to help her siblings with their homework.

On November 24, 2009, DHS filed another motion seeking emergency custody of the children, based on allegations that K.W. and C.W. were left alone. There was also an allegation that Gloria Tensley was allowed to have contact with the children in violation of the court's previous orders. Coleman had refused to take a drug test on November 19, stating that she would be positive for drugs if tested. An order of emergency custody was entered on November 24, 2009. The court subsequently granted temporary custody of K.W. and C.W. to their father at the probable-cause hearing, with Coleman having supervised visitation. The parents were ordered to cooperate with DHS and submit to random drug screens. The court also ordered that K.C. be placed into foster care if it is determined that Shawn Hurt was allowed to spend the night at Coleman's home.

Yet another review hearing was held on January 20, 2010. The primary goal of the case plan was to be reunification with Coleman. The court continued custody of K.W. and C.W. with their father while Coleman retained custody of K.C.

On February 12, 2010, the department filed a motion to terminate reunification services as to K.W. and C.W., alleging there was little likelihood that services to Coleman would result in successful reunification with the children. The motion also asserted that K.W. and C.W. are younger and require more supervision, direction, and parental care than their teenage sister K.C.

The hearing leading to this appeal was held on March 3, 2010. Kathy Ray, the DHS case worker, testified that the department was recommending that K.W. and C.W. remain with their father and that portion of the case be closed while K.C. remain in Coleman's custody. Ray said that the department was not asking to be relieved of providing services to Coleman and K.C., just to Wester, K.W., and C.W. She reported that K.W. and C.W. were

doing very well with their father, and that K.C. was doing better in school. Ray stated that Coleman was never home so the department could visit the home for inspections and drug tests. She noted that Coleman had recently moved, but she had been unable to visit the home.

On cross-examination, Ray said that the children had been out of Coleman's care for approximately nine months and that parents are usually allowed twelve months or more to attempt reunification. She explained that DHS was recommending the change in the case plan because of Coleman's lack of cooperation with the department. According to Ray, Coleman had not openly refused to allow DHS workers entry into her home, but simply refused to answer the door when they knocked. She said that the only contact she had with Coleman was when Coleman initiated the contact by calling her. She acknowledged that she knew Coleman's place of employment and phone number yet did not attempt to arrange for a time to visit Coleman's home. She called Coleman "grossly noncompliant." Ray explained that DHS was recommending that K.C. remain in Coleman's custody because of her progress in school and the fact that she is older and can "pretty much care for herself." She also said that DHS had not been able to randomly test Coleman for drugs because the only tests that were done were done on days court hearings were held and, thus, Coleman knew of the tests in advance. She said it would be easier for Coleman to give her an accurate work schedule so that they could arrange times to visit and conduct the drug screen.

Appellee Carolyn Coleman testified that she did not have anything negative to say about Wester or his parenting of K.W. and C.W., adding that he had done a very good job. Although she wanted the children to be with her, she said that Wester was the only other person she would want to have custody. She admitted that she had problems remaining in contact with DHS due to a work schedule that changed every week. She asserted that she had remained in contact with DHS by sending text messages to another case worker who called Coleman back. Coleman denied that she tried to avoid the DHS workers, adding that she never heard them knocking at her door. She said that DHS had been in her life since 2008 and that she "would rather [DHS] take care of somebody else." She also expressed her opinion that DHS could not provide her with anything other than to make sure things were "okay." Coleman acknowledged that she knew the location of the DHS office but had not dropped her schedules off. Nor had she sent her schedule to DHS by text message. She also admitted that she had failed at least one drug test, adding that her drug of choice was methamphetamine. She also said that she had received drug and alcohol counseling, but had not been to outpatient treatment.

On cross-examination, Coleman stated that she did not want the case closed on K.W. and C.W. unless they were going to go home with her, and she objected to the goal being changed. She added that she did not think it would take long, perhaps three months, for her to rehabilitate herself to get K.W. and C.W. back with her. She was willing to take advantage of whatever services DHS thought she needed in order to be reunified with K.W. and C.W.

Coleman said that she had given Wester approximately $600 to help with K.W. and C.W. since he has had temporary custody. She explained that she refused a drug screen on November 19, 2009, because she had taken two Xanax that were not prescribed to her. Coleman would not say that she had significantly complied with the court's orders and case plan, stating instead that she had "measurably" com-

plied. Although she preferred to have K.W. and C.W. returned to her, she acknowledged that it would be better for the children to finish the school year with their father. She asserted that she was financially able to care for her children and would rely on her job and Social Security benefits for the children.

Bill Sweetwood, a certified alcohol and drug counselor and a licensed addictions counselor, testified that he provided mental-health counseling and substance-abuse counseling to Coleman. He never felt that Coleman was avoiding him and said that she was not difficult for him to contact. He believed that he could make enough progress with her to warrant giving her additional time. Sweetwood had also been in Coleman's new home and reported that it was an appropriate housing environment. He believed they could work toward her providing the type of home environment and the type of parenting relationship that Coleman needed to be able to take care of the children within the near future.

Sweetwood said that, although there were issues of Coleman being in denial as to the extent of her substance-abuse problem, she had made improvements dealing with the issue. He also said that he was working with Coleman on anger and frustration issues, calling her testimony in court a "significant improvement" over how she handled herself during her testimony at earlier hearings. According to Sweetwood, Coleman had "pretty much" complied with everything in his treatment plan. He also said that there were times when Coleman had difficulty accepting responsibility for her actions.

Eddie Wester testified that K.W. and C.W. currently resided with him and that he wanted that arrangement to continue with him as permanent custodian. He added that he did not want the children completely pulled away from their mother

in the sense that Coleman could never regain custody or see the children. He said that the children had not had any problems in school since they had been with him, nor had there been any other issues. He agreed that Coleman should have standard visitation with the children. Wester did not object to Coleman having additional time to work toward eventually regaining custody of the children, stating that Coleman was making an effort to improve her situation in order to regain custody. According to Wester, the children preferred to live with Coleman. He said that he had visited Coleman's home and agreed that it was appropriate. Coleman had also given him money to help with the children and the transportation between Wester's home in Saline County and Coleman's home in Greene County. He said that the children were now stable whereas they had not been when they were with Coleman.

The court ruled from the bench and granted permanent custody of K.W. and C.W. to their father and closed their portion of the case, based on the fact that the children had been removed from Coleman's custody on three occasions. The court noted that it could not reconcile Coleman's testimony, finding that she talked out of both sides of her mouth. The court found no significant progress or compliance on Coleman's part. The court believed that it was in a bad position as to K.C., but left her in Coleman's custody and kept her portion of the case open. Coleman was granted standard visitation with K.W. and C.W. The order memorializing the court's ruling was entered on May 26, 2010. Coleman timely filed her notice of appeal.

In equity matters, such as juvenile proceedings, the standard of review on appeal is de novo, although we do not reverse unless the circuit court's findings

are clearly erroneous. *Judkins v. Duvall,* 97 Ark.App. 260, 248 S.W.3d 492 (2007). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed. *See id.* We give due deference to the superior position of the circuit court to view and judge the credibility of the witnesses. *See id.* This deference to the circuit court is even greater in cases involving child custody, as a heavier burden is placed on the circuit judge to utilize to the fullest extent his or her powers of perception in evaluating the witnesses, their testimony, and the best interest of the children. *See id.*

■ We note at the outset that some of Coleman's arguments are difficult to follow. Although the circuit court's order from which this appeal arises is styled as a permanency-planning order, Coleman argues that the order was, in reality, a no-reunification-services order that did not comply with the statutory requirements.[2] We need not decide whether the circuit court entered a no-reunification-services order because, even if we agreed with Coleman's argument, we hold that the court substantially complied with the requirements of [11] section 9–27–365 by making specific findings that the children had been removed from Coleman's custody on three occasions and that K.W. and C.W. had been successfully placed with their father and were without need of further services from DHS. One of the grounds for granting a no-reunification-services motion is a finding that a parent had subjected a

child to aggravated circumstances, which includes that the child had been removed from the custody of the parent or guardian and placed in foster care or the custody of another person three or more times in the past fifteen months. *See* Ark.Code Ann. § 9–27–365(c)(2)(A)(v).[3] Coleman does not dispute this finding.

Contrary to Coleman's argument, nothing in the Juvenile Code prohibits an award of permanent custody prior to the children being out of the home for twelve months. Moreover, the case had been ongoing for more than fifteen months at the time of the hearing.

■ In the present case, we cannot say that the circuit court clearly erred in placing K.W. and C.W. in the custody of their father. As previously mentioned, Coleman's actions required DHS to remove the children on three occasions over a fifteen-month period. Coleman was uncooperative with DHS regarding making herself available for drug testing, and most of the recent tests that had been performed were positive. Continuing drug use shows both an indifference to remedying the problems plaguing the family and is not in the best interest of the children. *Carroll v. Arkansas Dep't of Human Servs.,* 85 Ark.App. 255, 148 S.W.3d 780 [12](2004). Coleman herself admitted that she had not made significant progress with the case plan. This left the children in a state of uncertainty as to if, or when, Coleman could regain custody of them. Living in such a state of prolonged uncertainty is not in the children's best interest.

---

**2.** Arkansas Code Annotated section 9–27–365 governs motions for no reunification services and provides that any party may file such a motion at any time. Ark.Code Ann. § 9–27–365(a)(1)(A). The code also provides that an order terminating reunification services shall be based on clear and convincing evidence that termination of reunification services is in the children's best interests and a finding of

one or more of certain listed grounds. Ark. Code Ann. § 9–27–365(c)(1), (2).

**3.** Pursuant to Ark.Code Ann. § 9–27–365(d), if the court grants an order terminating reunification services, a separate permanency-planning hearing is not required if the court achieves permanency for the children through permanent custody.

*See Bearden v. Arkansas Dep't of Human Servs.*, 344 Ark. 317, 42 S.W.3d 397 (2001). There was also evidence that the children were thriving with their father. The primary consideration in child-custody cases is the welfare and best interests of the children involved; all other considerations are secondary. *Hicks v. Cook*, 103 Ark. App. 207, 288 S.W.3d 244 (2008). Because we are not left with a distinct and firm conviction that a mistake has been committed, we affirm. *See Judkins, supra.*

Affirmed.

GRUBER and BROWN, JJ., agree.