2011 Ark. App. 375

**Katherine KECKLER, Appellant**

v.

**ARKANSAS DEPARTMENT OF HUMAN SERVICES and Eduardo Kriete, Appellees.**

No. CA 10–1075.

Court of Appeals of Arkansas.

May 25, 2011.

Deborah Ruth Sallings, Little Rock, for appellant.

Keith L. Chrestman, Jonesboro, Katherine Blackmon Solis and Tabitha Baertels McNulty, Little Rock, for appellees.

JOHN MAUZY PITTMAN, Judge.

This is an appeal from an order terminating a pending dependency-neglect case and changing custody of a minor from his mother, appellant Katherine Keckler, to his father, appellee Eduardo Kriete. The minor, D.D., was seven years old when he was adjudicated dependent-neglected in October 2008. Appellant argues that the trial court erred in granting custody to Mr. Kriete because the evidence is insufficient to support an order changing custody either under the juvenile code or in a traditional change-of-custody procedure. We affirm.

Our review of equity matters, such as juvenile proceedings, is de novo on appeal, although we do not reverse unless the circuit court's findings are clearly erroneous. *Coleman v. Arkansas Department of Human Services*, 2010 Ark. App. 851, 379 S.W.3d 778. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed. *Id.* We give due deference to the superior position of the circuit court to view and judge the credibility of the witnesses. *Judkins v. Duvall*, 97 Ark.App. 260, 248 S.W.3d 492 (2007). This deference to the circuit court is even greater in cases involving child custody, as a heavier burden is placed on the circuit judge to utilize to the fullest extent his or her powers of perception in evaluating the witnesses, their testimony, and the best interest of the children. *See id.*

Here, the record shows that D.D. and his two siblings were adjudicated dependent-neglected in October 2008 because appellant's home was unfit, the children had inadequate food, and because appellant had left these young children home alone overnight. In January 2009, the Arkansas Department of Human Services (DHS) sought emergency custody of the children because appellant was incarcerated in the Fordyce jail for hot checks and had left the children with an inappropriate caretaker. The children were placed with their maternal grandparents, but during this time D.D. was repeatedly admitted to the Pinnacle Pointe Acute Hospital because of severe psychiatric and behavioral problems. These repeated hospitalizations led ultimately to D.D. being placed at Centers for Youth and Families in Monticello, Arkansas.

A report prepared by DHS for a review hearing on May 12, 2009, recommended that the case goal be reunification and that the children be returned to the custody of appellant, including D.D. once his placement at Centers for Youth and Families was complete. The report noted, however, that appellant had not consistently maintained food and utilities in the home and that she had failed to pick up food at a food pantry on May 5 even though a DHS worker had arranged for the food to be available and the food pantry had stayed open one hour past closing time waiting for her to arrive. The report also noted that appellant was unemployed and that the family's source of income was the child support of $700 per month that appellant received for D.D. from appellee Kriete, and that, following her drug screening on April 24, appellant tested positive for amphetamines. In his review order of May 15, 2009, the trial judge allowed appellant a thirty-day trial visit with the older children, but ordered that D.D. remain at Centers for Youth and Families to complete his program. Appellant was ordered to comply with the case plan, keep the home clean, maintain food in the home,

submit a copy of paid utility bill receipts to DHS monthly, and ensure that the children get to school every day and counseling appointments as scheduled. The following month, the trial court entered a review order on June 9, 2009, returning custody of the children to appellant with a protective-services case to remain open. Appellant was ordered to comply with the requirements of the previous order, to submit to random drug screening, and to refrain from writing hot checks.

The children entered foster care again on October 8, 2009, because of physical abuse of D.D. by appellant, but were returned to appellant's custody following a probable cause hearing on October 11, 2009. A report prepared by DHS for a November 10, 2009, review hearing stated that D.D. had run away from appellant's home on several occasions because he was spanked for not doing his chores, and that he had an outburst on October 21, 2009, when appellant did not allow him to go for a walk with his older brother. Following the latter outburst, appellant applied restraints to D.D. as instructed by Centers for Youth and Families. Following another angry outburst by D.D. on November 1, 2009, appellant calmed the child within one hour. The November review hearing resulted in an order that services be continued and that all three children remain in the custody of appellant, but a report prepared for the review hearing of January 12, 2010, stated that D.D. had been readmitted to the Centers for Youth and Families as a result of behavior problems on December 17, 2009. These problems included stealing from a store and kicking out car windows. It was also reported that D.D. had been fighting staff at the facility, which asked appellant for consent to change D.D.'s medication. Appellant initially refused the request, but later changed her mind. Finally, the report stated that appellant had informed DHS that she had breast cancer. Following the January 12 hearing, attended by the attorney for D.D.'s father, appellee Eduardo Kriete, the trial court ordered that the children remain in appellant's custody, that D.D. remain in the Centers for Youths and Families until released by staff recommendations, and ordered a home study for appellee Eduardo Kriete.

The DHS report for the review hearing of April 13, 2010, made no recommendation regarding the children's placement. It noted that the ordered home study on appellee had been requested but not yet received. The report further noted that D.D.'s behavior had improved, that he was currently visiting his family at home every other weekend, that the visits had all gone well, and that D.D. had been assigned a tentative discharge date of July 16, 2010, by Centers for Youth and Families. Finally, the report stated that appellant remained unemployed and that her income consisted of child support received for D.D., school-related grants, and food stamps. Following the review hearing of April 13, 2010, attended by appellee Eduardo Kriete in person as well as by his attorney, the trial court expressed dissatisfaction in appellant's continued failure to learn from homemaker services, and stated that appellant was doing her children a disservice by telling them she has breast cancer, yet not seeking treatment. The trial court ordered that custody of the children remain in appellant with the goal of reunification, and granted permission to appellee, as D.D.'s father, to have visitation with D.D. at the Centers for Youth and Families upon approval of the therapist. D.D. was also permitted visitation with his siblings and stepmother from Mr. Kriete's family.

On May 7, 2010, appellee Eduardo Kriete filed a motion for modification of custody in the dependency-neglect pro-

ceeding, asserting that he was the legal and biological father of D.D., that D.D. was currently in the legal custody of appellant and residing at the Centers for Youth and Families, and that appellant contacted him late in 2009 requesting that he take custody of D.D. Appellee Kriete candidly admitted that he had no relationship with D.D. at the time of the request, but he stated that he and his family had begun developing a significant relationship with his son and that they would continue to foster that relationship in hopes that D.D. would be able to become a permanent part of his family. He stated that D.D. had made significant progress in his recent treatment, and expressed his concerns that appellant had made ₍₆minimal progress despite the services offered by DHS, and that appellant's physical and mental health would prevent her from consistently fulfilling her parental duties. Finally, he stated his belief that returning the child to appellant would be to return him to the abusive and unstable environment that had fostered his behavioral problems, and that he and his family were ready and able to provide D.D. with the physical, financial, mental, educational, spiritual, and emotional stability that would allow D.D. to build upon his progress at the Centers for Youth and Families. Appellant did not respond to this pleading.

After a hearing on July 13, 2010, the trial court found that D.D. required a structured and calm lifestyle with stability and a routine that was impossible for him to have in appellant's home, and that appellee's home would provide D.D. with the routine, structure, and stability that he needs. In an order filed July 15, 2010, the trial court granted appellee's motion for modification of custody, ordered that appellee should be allowed to travel both within the United States and internationally with the child, and closed the case as to all issues except visitation, which would be set by the trial court at a future hearing if the parties were unable to reach an agreement. This appeal followed.

■ We first address the issue of finality. Appellee DHS argues that the order of July 15, 2010, is not final because it left open the issue of visitation, thereby failing to dispose of all parties and issues. It is true that Ark. R.App. P.-Civ. 2(a)(1) permits appeals only from final judgments or decrees. Rule 2(d), however, permits an appeal from any order final as to the issue of custody, regardless of whether the order resolves all other issues. *West v. Arkansas ₍₇Department of Human Services,* 373 Ark. 100, 281 S.W.3d 733 (2008); *see Ford v. Ford,* 347 Ark. 485, 65 S.W.3d 432 (2002). Although collateral issues are outstanding, the trial court's custody order was in no sense conditional. Our jurisdiction is therefore proper.

■ We initially note that appellant has advanced several challenges to the change-of-custody order based on statutory compliance. These, however, were never presented to the trial court, and we do not address arguments raised for the first time on appeal. *See Broderick v. Arkansas Department of Human Services,* 2009 Ark. App. 771, 358 S.W.3d 909; *Arkansas Department of Health & Human Services v. Jones,* 97 Ark.App. 267, 248 S.W.3d 507 (2007).

■ Pursuant to Ark.Code Ann. § 9-27-334(a)(2)(A) (Repl.2009), if a juvenile is found to be dependent-neglected, the circuit court may enter an order transferring custody of the juvenile to a relative or other individual if to do so is in the best interest of the juvenile. On de novo review, we find that the order transferring custody of D.D. to appellee was in the child's best interest.

Jennifer Cotton, who was D.D.'s primary therapist at Centers for Youth and Families, testified that D.D. suffered from bipolar disorder[1] and therefore required a great deal of structure. Establishment of a regular routine, expectations, and rules was especially important for D.D., she said, because he had an extensive history of substantial mood instability and could become aggressive when he was overwhelmed. Although she had observed D.D. becoming calmer and improving following visits by both his father and his mother, she opined that D.D. had been adversely affected by the chaos in his mother's home, which she described as a consistent lack of overall structure and attributed this in large part to the many teenagers coming in and out of appellant's home. Ms. Cotton testified that she was aware that D.D. would be living in El Salvador if placed in his father's custody but that, based on her observation of the interactions between father and son, she had no reservation concerning D.D. residing out of the country so long as mental health services were available to him.

Felicia Cobb, a DHS caseworker familiar with D.D.'s case, testified that the children in appellant's home had poor attendance at school and that one of them passed only two classes—band and drama—and was required to repeat the school year. Another child was doing better, although his grades fluctuated, and Ms. Cobb stated that this child had assumed the parenting role in the home. She opined that appellant had not been doing all that she could do regarding the home and case plan, and her lack of follow-through resulted in sporadic and inconsistent results. Appellant's home, she said, was not a scheduled, consistent, and stable environment; that there had not been food in the house on a consistent basis; and that there were a lot of teenage boys moving in and out of the house who were not appellant's children. Ms. Cobb met some of these boys at appellant's house; appellant introduced one of the boys as the vocalist and another, who had spent the night, as the bass player, but Ms. Cobb did not know who they were or why they had appeared with appellant and her children at the custody proceeding.

After being qualified as a witness, nine-year-old D.D. testified that he liked living with his mom and brothers and could not remember living with his dad, although his mother told him that he had done so when he was a baby. He had met his brother and sister in his father's family, and his stepmom, and he liked them all. D.D. testified that he knew that his dad lived in a foreign country called El Salvador, that he did not know where that was, and that he would like to visit his dad but not live with him. He wanted to go visit with his dad for two months each year in El Salvador. He said that he liked his school in Arkansas and had friends there. On cross-examination by the Department, D.D. testified as follows:

> I usually wake up early in the mornings. I get up at like seven, but today I didn't, because I went to sleep at about eleven last night. I usually go to sleep at eight with my medicine, but I was running really late on my medicine, because we were out grocery shopping and stuff.
>
> We do have a lot of groceries in my house, a lot since yesterday. We went and got groceries yesterday. Before that we didn't have much food in the house. We had enough for us. Two

1. D.D. has also been diagnosed with oppositional-defiant disorder, ADHD, and parent-child relational problems.

days ago we went to the Dollar Store to get enough until yesterday. Yesterday for lunch I had ice cream. Ice cream and actually, a little bit of that is actually good for you. It's milk. That's all I ate for lunch. I was late on breakfast yesterday. I was late on breakfast, because I woke up at twelve yesterday. My mom woke up at three. She usually wakes up around one. I'm usually up a long time before my mom wakes up, before everybody wakes up. I actually am all up before everybody, all by myself.

. . . .

Friends were sleeping over at my house yesterday. Those are members of the band that Ms. Felicia met. They play in the band at my house. I'm going to be one of their singers. Me and mom can sing really good.

I remember telling Ms. Felicia yesterday that I ate ice cream for lunch because there wasn't anything else and nobody would fix me anything because they were asleep. I didn't get up to eat breakfast because nobody would fix me anything and I was the only one up. That happens a lot so I wait until everybody wakes up.

There's not that many beer cans lying around in my house right now. I don't remember where they're from. Some friends drank the beers. Friends of my mom. They threw them away but I was cleaning and they fell out of the trash. I was cleaning and they fell out of the trash can, because I had to get all of this trash out of the living room. I had to do that because I was cleaning. I did not know someone was coming. I just cleaned up all by myself. [My brothers] Q. and K. wouldn't help. Mom didn't help because she has a broken leg. It was only the living room.

I don't have to eat at my grandma's a lot. I only get to visit her once a day. When I go over there I eat snacks. She can make grilled cheese for a snack and then put sour candy on it, some chips.

They have fixed the hole in the floor of our house with a pallet. A wood pallet over the hole in the floor. If I move the pallet I'll fall into the ground. I fell in and got some scratches on me a few days ago, two days ago. I still have scratches from the hole.

D.D. was also questioned by the attorney ad litem and said that his mom hurt her leg when she was trying to jump out of Jordan's truck when they were all at the river. He explained that Jordan was one of the friends he was talking about earlier when he was talking about the beer cans. D.D. explained that Jordan and Mallack were in the Eternalization Band with D.D.'s sixteen-year-old brother, K., and that Jordan, Mallack, and K. drank the beers. He stated that his mother was there when they were drinking beer, but his mother didn't drink any because she only drinks when she is really depressed. D.D. said that his mother was in the band as the lead singer and that they do not play anywhere except in the house. Both Jordan and Mallack were twenty-one years of age. Finally, D.D. testified:

I had pizza for breakfast today. I got pizza from my house. I threw it up today. It was a microwave pizza. Them little pizzas. We bought it yesterday but not at the Dollar Store. We went to the grocery store yesterday because the day before yesterday we went to the Dollar Store so we could eat until yesterday. Mallack microwaved the pizza for me.

Appellant testified that she had known appellee for twenty years, that appellee was able to provide for D.D. financially, that she thought D.D. should have a rela-

tionship with his father and had urged appellee to do so for years, and that she was grateful that appellee has realized that he needs to be part of his son's life. She denied that she was unstable or that it would be in D.D.'s best interest to be placed in his father's custody. On cross-examination, appellant denied that she told appellee that she had breast cancer and stated that she actually said that there was a chance that she had breast cancer but would not know until she went to the Abraham Breast Clinic. She testified that she had never gone to the clinic and, therefore, still does not know whether she has breast cancer. She denied that the band members spent every single night at her house, asserting that they only stayed there about half the time. She admitted answering the door in a bikini the day she picked D.D. up from the Centers for Youth and Families. She identified a photo of herself in a bikini, eyes shut, lying languorously against Jordan with Mallack's head pressed close to hers and Q. grinning in the background. She admitted that she had posted that photo on Facebook's internet website.

Appellee Eduardo Kriete testified that he had been married to his wife, Sandra, for three years. He stated that he had been 100 percent involved in raising his daughter Vera Maria, a child psychologist living in San Diego, and his son Eddie, a university student in Florida. Both of his children, he said, had been in contact with D.D. and were excited for their little brother. Mr. Kriete testified that he and his wife were able to obtain a private home study on his primary U.S. residence in South Carolina.

The home study, admitted without objection, showed that appellee's South Carolina home was a spacious log residence with an attachment housing a separate apartment and two guest rooms. The property caretakers reside in the attached apartment. The investigator reported that there were ample rooms, storage space, and restrooms; that the dwelling was secluded and well maintained; and that no health or safety hazards were observed. The report also contained photographs of the bedroom with an attached bath designated for D.D. Investigations disclosed no criminal records or mental-health history for appellee or his wife, or for the caretakers of their South Carolina home. The report additionally stated that neither appellee nor his wife had any health conditions or took any prescription medications, and that they have no children living with them currently. References, including friends, employees, and a retired South Carolina sheriff, were uniformly positive, indicating that appellee was a good neighbor, kind-hearted, and passionate about his family. Appellee was financially independent, being the co-owner of an airline and the beneficiary of a family trust, and has zero debt other than installment payments on two automobiles. The report also indicated that appellee had supported Vera and Eddie during their educational careers and paid monthly child support for D.D.

Mr. Kriete testified that the information provided by and to the investigator was correct and honest. He said that his primary residence in El Salvador was very, very big, that his family had been wealthy for many generations, and that he was fortunate to have lived a life with privilege. He stated that he understood D.D.'s problems and had the knowledge, discipline, means, and available psychological treatment to care for his son in El Salvador. He had consulted with and obtained letters from two international schools suitable for an English-speaking child indicating that D.D.'s acceptance was assured. These schools were within five minutes of his home and would provide D.D. with instruction in the Spanish lan-

guage in addition to the general curriculum. Mr. Kriete further stated that there were facilities nearby where D.D. could obtain counseling and medication management, that he would enroll D.D. on a one-to-one basis with a psychiatrist in El Salvador, that he would appreciate and value the input of Jennifer Cotton, and that he had invited Ms. Cotton to come to El Salvador to observe D.D.'s treatment and to advise.

Mr. Kriete acknowledged that he had no involvement with D.D. until appellant telephoned him and asked him to take custody of his son because she had breast cancer, but at that point he had to take responsibility for his son and began the process that led to the custody proceeding. He acknowledged that, as a foreign national, he could not reside permanently in the United States, his visa limiting him to a period of four to six months, but that he would arrange for D.D. to have regular visitation with his mother, and he would invite her and her other two sons to visit in El Salvador.

It appears that D.D.'s problems are substantial, that appellant is unable to provide him the degree of stability that he needs, and that appellee is willing and able to do so. On this record, we cannot say that the trial court erred in awarding custody of D.D. to appellee, and we affirm.

Affirmed.

ABRAMSON and MARTIN, JJ., agree.