Cite as 2023 Ark. App. 353

# ARKANSAS COURT OF APPEALS
## DIVISION II
### No. CV-22-712

| | |
|---|---|
| JAZMIN WALDON<br><br>APPELLANT<br><br>V.<br><br><br>FREDDIE YOUNGBLOOD, ARKANSAS DEPARTMENT OF HUMAN SERVICES, AND MINOR CHILD<br><br>APPELLEES | Opinion Delivered August 30, 2023<br><br>APPEAL FROM THE SEBASTIAN COUNTY CIRCUIT COURT, FORT SMITH DISTRICT [NO. 66FJV-21-125]<br><br><br>HONORABLE DIANNA HEWITT LADD, JUDGE<br><br>AFFIRMED |

### ROBERT J. GLADWIN, Judge

This is an appeal from the circuit court's order awarding joint custody to Jazmin Waldon ("Waldon"), the minor child's mother, and Freddie Youngblood ("Youngblood"), the child's father, after a review hearing that occurred on March 15, 2022. The appellant, Waldon, argues that the court's order was erroneous because it failed to require a home study for Youngblood before awarding him joint custody and that the joint-custodial arrangement is not in the minor child's best interest. We affirm.

### I. *Background Facts*

Waldon is the mother of three children, and the custody of only one of those minor children is at issue in this appeal. On April 2, 2021, the Fort Smith Police Department ("FSPD") received a call about two toddlers roaming the neighborhood at night without an

adult or caregiver. At approximately 9:40 p.m., the FSPD located Waldon—the mother of one of the unattended toddlers—who stated that she had been upstairs getting her hair done for the Easter holiday. The other reported toddler was the son of Waldon's sister. Waldon also informed the FSPD that she has two other minor children who were asleep upstairs. She informed the police officer that she had last seen her daughter asleep in her bedroom upstairs. The FSPD arrested Waldon for two counts of first-degree endangerment of a minor. The Arkansas Department of Human Services ("DHS") put a seventy-two-hour emergency hold on all of Waldon's children because her arrest resulted in no legal caregiver for the minors. On April 5, 2021, DHS filed a dependency-neglect petition that alleged the children's removal from Waldon's parental care was necessary to protect their health, safety, and physical well-being from immediate danger and that it was contrary to the welfare of the children to remain in Waldon's custody. The minor child that is the subject of this appeal was placed on a trial home placement with Youngblood—the child's biological father—who signed an acknowledgment of paternity in 2011.

On June 21, 2021, the court adjudicated the minor child dependent-neglected due to Waldon's parental unfitness and noted that Youngblood did not contribute to the dependency-neglect. At this time, the goal was reunification with a concurrent goal of guardianship; custody of the child remained with DHS. This order was not appealed. The circuit court then scheduled a review hearing for August 10.

After the review hearing, the court entered an order declaring that the children should remain in the custody of DHS and that the goal of the case remained reunification

2

with a concurrent goal of custody with a fit parent. Another review hearing was set for November 30, with the court ordering Waldon to resolve her criminal charges as soon as possible. The record reflects that the criminal charges stemming from the night the children were removed from Waldon's custody were resolved on the same day that this particular review hearing was held.

Waldon and Youngblood moved to continue the next review hearing, declaring that they both needed additional time to prepare testimony and witnesses regarding the remaining custody and visitation issues. The court continued the hearing until January 11, 2022. Youngblood, however, filed for another continuance because his counsel anticipated that the hearing would require more time than the court's docket allowed on such date; therefore, the final hearing was rescheduled for March 15.

Prior to the final hearing, Waldon, Youngblood, and the attorney ad litem for the minor child filed pretrial briefs outlining their respective positions. The attorney ad litem argued that both parents were considered "fit" under the permanency statute; thus, both were legally entitled to be considered for custody. The ad litem, however, concluded that "on balance as between two fit parents in this dependency-neglect matter, the context favors a return of [minor child's] custody to Waldon over Youngblood, who has never had custody at any point in [minor child's] life." Youngblood asserted in his pretrial brief that custody of the minor should be placed with him and visitation awarded to Waldon. Waldon's pretrial brief was not filed with the circuit court; therefore, it is not part of our record on appeal.

The final hearing was held on March 15. At the beginning of the hearing, counsel for DHS clarified for the court that while its initial recommendation had been for a return of minor child to Waldon, the department's current position was that either parent was fit for custody. The court noted that Youngblood had requested joint custody, and the final hearing was to determine the best interest of the child. Youngblood took the stand and called the minor child's teacher; Waldon called the minor child to testify and then rested her case after testifying herself.

Youngblood testified that while he was asking for custody of the child, he acknowledged that Arkansas considers joint custody to be a "starting point" when it comes to minor children. Therefore, he agreed that he was asking for joint custody—in the alternative—with him as primary custodian. When asked about a joint-custody arrangement, Waldon testified that while they "coparent fine," she did not believe that joint custody was a stable situation emotionally for the child. However, she was agreeable to Youngblood having liberal visitation. The minor child did not offer any opinion about where he preferred to live and stated that there was nothing that he did not like at either of his parent's homes.

The attorney ad litem provided his recommendation to the court regarding what he believed to be in the child's best interest. He stated that the minor child was attached to both his mother and father and their respective families; that the child had lived exclusively with Waldon until the child was removed from her custody; that the child, moving forward, needs to have as much contact with both parents as possible; that he believed it was in the

4

child's best interest to be returned to Waldon; and that his opinion was consistent with the minor child's wishes.

At the end of the hearing, the court took the matter under advisement and later entered a review and closing order on August 12. The circuit court found that it was in the best interest of the minor child to be in the joint legal and physical custody of both Waldon and Youngblood. Additionally, it ordered the parents to work together as joint custodial parents and to have equal—or as close to equal—time with the child as possible. The court further ordered that both parents shall share the right to make important decisions for the child and attached to the order a standard order regarding child visitation and related matters. It also made allowances for open access to educational records and events by both parents and for yearly rotational claims of the child as a tax dependent. Finally, the court held that the DHS case was closed. Waldon filed a timely appeal of the order; this appeal followed.

## II. *Standard of Review*

Although this court reviews child-custody decisions de novo on the record, the findings of the circuit court will not be disturbed unless it is shown that they are clearly against the preponderance of the evidence. *Durham v. Durham*, 82 Ark. App. 562, 120 S.W.3d 129 (2003). A finding is clearly against the preponderance of the evidence when, although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been made. *Id.* Since the question of the preponderance of the evidence turns largely on the credibility of the witnesses, the appellate court gives special

5

deference to the superior position of the circuit court to evaluate and judge the credibility of the witnesses in child-custody cases. *Carver v. May*, 81 Ark. App. 292, 101 S.W.3d 256 (2003). We have often stated that we know of no cases in which the superior position, ability, and opportunity of the circuit court to observe the parties carry as great a weight as in those involving children. *Id.*

### III. *Points on Appeal*

Appellant argues (1) that the circuit court erred in modifying custody without a required home study as required by the juvenile code; and (2) that there was insufficient evidence supporting the circuit court's conclusion that joint custody was in the best interest of the minor child; thus, the order should be reversed because it was uninstructive—forcing her and Youngblood to figure out how to evenly split parenting time under acrimonious circumstances.

### IV. *Discussion*

### A. Home Study

First, Waldon argues the circuit court erred in modifying custody without a required home study; thus, the order granting Youngblood joint custody of the minor child must be reversed. In response, both Youngblood and DHS argue that because Waldon failed to raise and secure a ruling from the circuit court on this issue, she is precluded from asserting this argument as a basis for reversal on appeal. We agree. The record reflects Waldon never argued that a home study was required of Youngblood at any time throughout the proceeding. This court has consistently held that a party's failure to present an argument

6

before the circuit court cannot form the basis for reversal. Thus, Waldon failed to preserve this argument for appeal and waived any argument that a home study was required of Youngblood prior to the final custody hearing.

## B. Joint-Custody Arrangement

Furthermore, Waldon argues that the circuit court's order must be reversed because there was not sufficient evidence that joint custody was in the minor child's best interest. Specifically, she contends that the court's order was "woefully uninstructive," thereby forcing her and Youngblood to evenly split parenting time despite "undisputed evidence" that Youngblood is incapable of effective communication. Finally, she argues that the circuit court's order erred by failing to specifically address what impact the joint-custody arrangement would have on the minor child as well as how the part-time separation from his younger siblings would affect the child.

Waldon insists on appeal that the circuit court's joint-custody finding was clearly erroneous because of the parents' "historical inability to co-parent" and Youngblood's prior history (or lack thereof) with the child. Additionally, Waldon contends that the arrangement has left the minor child in an unstable and exhausting situation and cites a multitude of facts to demonstrate that "there is a much more systemic problem that prohibits effective coparenting." The level of animosity outlined in Waldon's appeal, however, is simply not reflected in either the record or her testimony before the circuit court.

Specifically, Waldon testified that she and Youngblood "coparent fine" when asked about the option of joint custody. While the record clearly reflects that these parents have

7

a certain amount of dislike for one another and communication has been difficult in the past, it does not rise to the level of toxic coparenting that Waldon describes on appeal. In fact, Waldon testified that she was agreeable to Youngblood having visitation every weekend and all of the holidays, and she would do her best to fulfill whatever custody order the court entered on behalf of her child. Simply put, there was no indication from either parent that he or she was unwilling to work with the other or fundamentally incapable of doing so. Both parties were clear that all that was left to be determined was custody, and the court began by reiterating that the purpose of the hearing was Youngblood's motion for custody. If Waldon believed that a joint-custody arrangement was impossible due to her and Youngblood's "long standing and contentious" relationship, it was imperative for her to have expressed this to the court, and she did not.

The primary consideration in child-custody cases is the welfare and best interest of the children involved; all other considerations are secondary. *Coleman v. Ark. Dep't of Hum. Servs.*, 2010 Ark. App. 851, 379 S.W.3d 778. The evidence established that Youngblood was able to provide the child a stable home life during the entire dependency-neglect process, which lasted nearly a year; that Youngblood did not contribute to the dependency-neglect; that the child enjoyed living in both homes; that DHS deemed both parents fit; that the attorney ad litem declared that the child was attached to both of his parents and his half siblings on his father's and mother's sides; that the attorney ad litem stated that he believed it was in the child's best interest to have "as much contact with both parents as can be

8

possible"; and that the attorney ad litem believed both Waldon and Youngblood were fit parents.

While Waldon is correct that the attorney ad litem proclaimed it was in the child's best interest to remain with Waldon, she is essentially asking this court to reweigh the evidence. It is well established that we will not act as a super fact-finder, and furthermore, it is not reversible error for the circuit court to weigh the evidence differently than the appellant asks for it to be weighed. *Bentley v. Ark. Dep't of Hum. Servs.*, 2018 Ark. App. 374, 554 S.W.3d 285. In awarding joint custody, the circuit court ordered the parents to work together as joint custodial parents. The court's determination that Waldon and Youngblood could work together to establish a joint-custody arrangement is supported by the record; thus, we find no clear error in the circuit court's order awarding joint custody.

Finally, Waldon's argument that the circuit court's order lacked instruction as to how she and Youngblood shall uphold the joint-custody arrangement is argued for the first time on appeal. If Waldon required clarification on the matter, it was her obligation to request it from the circuit court, and she did not do so. The record is devoid of any motions for clarification, for reconsideration, or to vacate the order by Waldon. The notice of appeal is all that followed the final order. The same goes for Waldon's argument that the court failed to address how joint custody would affect the child, who would now be separated part time from his maternal younger siblings. *See Minchew v. Ark. Dep't of Hum. Servs.*, 2023 Ark. App. 95, 660 S.W.3d 909 (declining to consider appellant's sibling-separation argument because she failed to preserve it for appeal). Moreover, Arkansas appellate courts have consistently

held that sibling-separation arguments will not support reversal absent some evidence of a genuine sibling bond, which was not demonstrated in the record here. *E.g.*, *Martin v. Ark. Dep't of Hum. Servs.*, 2020 Ark. App. 192, at 6, 596 S.W.3d 98, 102. If anything, the record demonstrates that the minor child has a genuine connection with siblings on both sides of his family; thus, joint custody will allow him equal time with all his siblings. Because both arguments were not preserved on appeal, we decline to reach their merits.

V. *Conclusion*

Giving deference to the superior position of the circuit court in child-custody cases, it cannot be said with distinct and firm conviction that a mistake has been made by the circuit court. Thus, we affirm the circuit court's award of joint custody.

Affirmed.

BARRETT and HIXSON, JJ., agree.

*Leah Lanford*, Arkansas Commission for Parent Counsel, for appellant.

*Ellen K. Howard*, Office of Chief Counsel, for separate appellee Arkansas Department of Human Services.

*James & Streit*, by: *Jonathan R. Streit*, for separate appellee Freddie Youngblood.